Brooke, J.
I think it impossible that the notes for a will in this case, though read to the sick man, and pronounced by him to be right, as is proved by Farker the scrivener, were meant by him to contain the will, the final will he intended to make. The notes were no doubt intended as an outline of his will. There are not materials enough in them for a final will. It was not intended to be left conclusively to the scrivener to make more specific disposition of the property than was to be found in the notes. For example, would it be intended to be left to him, under the expression “ girls to receive more negroes,” to decide how many more, and *137 of what age and sex, each of the girls was to receive; or to explain other obscure clauses in the notes ? I think not. Parker, the witness and scrivener, says, the testator told him he did not wish him to write his will at that time, but desired him to make a memorandum by W'hich his will was thereafter to be prepared. He then proceeded to make the memorandum under the direction of the testator; then read it to the testator, who looked over it, and said it was right. The scrivener then went away, promising to return on friday; evidently that the deceased might again have it in his power to explain his meaning in the very vague and unfinished clauses in the memorandum. The other witness, Paw-lings, speaks of his great anxiety that the scrivener should return before he died. He said, if Parker would come and fix his business, he would die satisfied. If he had supposed that the notes contained his whole and final will, and wanted nothing but form, he could not have been so anxious that the scrivener should return. I know that there are cases quoted by counsel from Eccles. Rep. the decisions of sir John Nicholl and other judges, that have gone farther than this case. But this court has not adopted those cases, especially the cases in which the notes were not read over to the deceased, nor the instructions, after being reduced to writing, seen by him. Suppose the scrivener had substantially given form to the notes in pencil, and returned with the draught to the deceased ; it is not possible to believe that he would have executed it as his will, without change in several particulars. In coming to the conclusion that the notes do not contain the will of the testator, I do not put the case on the ground that the notes are too obscure, or that they are too uncertain for a will (because wills regularly proved are often so) but on the ground that the testator, though he said they were right, did not intend that they should, if expanded into form, be the final disposition of his property. *138 I cite none of the numerous cases on the construction of wills, for though they are to be resorted to for rules of construction, they furnish no light to guide us to the intention of a testator. Nor do I put the case on the ground that the real and personal estates are so commingled, that as the notes cannot be proved as to the real estate, it would defeat the intention of the deceased if they were admitted to probate as to the personal estate; (because there are cases in which a will has been admitted to probate as to the personal estate and not as to the real, by which the testator’s whole plan of provision for his family has been defeated ;) but on the ground that the notes were not designed by the deceased to include his final will as to the disposition of his property.
I think the judgment must be reversed.
Tucker, P.
This case has been argued with very great ability, and the court is much indebted to the diligence of counsel for collating all the cases calculated to throw light upon its difficulties. Among other authorities, we have had an array of all the ecclesiastical decisions; an advantage which was denied to the court in some of our own cases, decided before the publication of those reports. Yet I apprehend they will be found not to have gone farther than the reported cases in the courts of common law. As long ago as the reign of Henry 8. when the first statute of wills was passed, the most latitudinous construction was given to the power of devise. That statute provided that “ every person should have power to give, dispose, will, and devise by will in uniting, or otherwise by act executed in bis lifetime, all his manors, lands” &c. The courts (upon the principle, I presume, of construing liberally a remedial statute) went to very great lengths in establishing imperfect wfills. They seem to have considered a literal compliance with the statute sufficient, and if *139 the substance of the devise was proved satisfactorily, , . , . . . . . and it was reduced to writing, no matter by whom, provided it was in the testator’s lifetime, they held it good. Accordingly, as long ago as the time of lord Coke, a will was held good where a lawyer took only short notes with a design to reduce it into form, which he after-wards did, but the devisor died before it was read to him. Brown v. Sackville, Dyer 72. note. S. C. Anderson 34. The great mischiefs and frauds to which this loose mode of disposition gave rise, led, in the reign of Charles 2. to the statute of frauds and perjuries, prescribing the formalities and ceremonies in the devise of lands, which still prevail. By a subsequent clause of the same statute it was declared that no nuncupative will should be good, except such as were made and proved according to the requisitions of the statute. This was equivalent to declaring that no will of personals should be valid unless it was in writing, or executed with the solemnities required in the case of nuncupative wills. Now, while the statute of Henry 8. wras an enlarging statute, this statute of Charles was a restraining statute, and should have been construed upon opposite principles; and the rather, as the mischiefs arising from the loose practice under the former constituted the very ground of enacting it. Yet it must be confessed that the courts have gone to the utmost limits of the former decisions, and at this day, in the english ecclesiastical courts, instructions for a will, given with a design that they should be reduced to form, would be held and taken to be a good will, though never read to or approved by the testator, provided it should appear that he was prevented from completing the will in the form which he designed, by the act of God. I do not think our courts have gone so far, but on the contrary they seem to have rejected notes for a will, though dictated by the dying man, where it did not appear that they had been read over and approved by him. Mason v. *140 Dunman, 1 Munf. 456. In doing so, they have cerlainly adhered to the spirit of the statute, though they have departed from english authority. For the object of the statute, in requiring writing, was to prevent the fraud and perjury which may so easily be perpetrated where the wills of testators are left to the slippery memory of witnesses. But how is this effected if the writing is never seen, read or approved ? What is such a will, after all, but a nuncupative will reduced to writing in the testator’s lifetime; a will depending altogether upon the memory and the veracity of one, instead of two or three witnesses ? for with us, one witness has been held sufficient to establish a written will of personalty. How are we assured, except by the oath of one man, that he has not mistalcen, even if he has not designedly misrepresented, the decedent’s meaning? Writing was designed, among other things, to give assurance that the will should not be mistaken; but this important object is frustrated, if it be deemed unnecessary that the instructions should be read over to the testator. I think, therefore, our courts wisely went back to the statute, instead of following the ecclesiastical courts. Happily the question, since our recent act, has ceased to be of much importance, and fortunately too, even in this case, it is unnecessary to take it up. For here the notes or instructions were written according to dictation, and were afterwards read over, examined, and approved by the testator.
The question in this case is of a very different character. It is contended by the appellant that the paper propounded is not a testamentary paper; that it is not a will; that it does not imbody the provisions designed by the testator in reference to his estate; that it was not looked to as so imbodying them, either by the decedent or the scrivener, but that it contained hints only, designed by the scrivener for his own direction, leaving much that was essential in the testator’s directions to *141 be filled up from memory. On the other hand it is contended that the paper itself is the true last will of the decedent, and as such was properly admitted to probate.
In order to sustain this memorandum as the decedent’s will, it is not necessary that he should have designed the identical paper to be his will. Where the transaction takes place in extremis, the instructions for a will may be taken to be the will itself, however plainly it may appear that the design was to draw out the notes into form, and to execute such draught as the last will and testament. For if the decedent’s will be final, settled, and completely declared by the instructions, the failure to complete his design of executing a more formal draught will in general not be important. But the paper propounded must be, first, his final determination at the lime, as to the disposition of his estate. If his mind was not then made up, the instrument cannot be his will; for we cannot conceive of the exercise of will, where a party has not made up his mind. 2dly, it must also be complete, that is to say, it must contain the whole will of the testator; subject how'ever to this modification, that if a particular bequest stands altogether independent, it may be sustained, although other intended bequests have not been reduced to writing before the testator expired. : As where he directs a slave to be given to A. and another to B. they being strangers to his blood, and the bequest to A. is reduced to writing, but the testator dies before that to B. can be so, the former will be good though the latter is void. But this can only be where what is not reduced to writing is not complicated with what is, for if it be, then the whole is void. As if the bequest be of a slave to A. upon condition, there, if the bequest be written, but the testator die before the condition is reduced to writing, the whole is void. Butler v. Baker, 3 Co. Rep. 31. So (I conceive) if, in contemplation of a distribution by *142 will of his estate among his children, the decedent direels so many slaves to be given to his eldest son, and so many to his second son, See. and the first bequest is reduced to writing, and he dies before the others are or can be written down, the whole is void ; because all the bequests are so linked together that they cannot be separated without violence to the decedent’s intention; for if the bequest to the eldest .is held valid, he will have his full portion by the will, and will then be entitled to a full share of the estate undisposed of, as distributee. The whole of the bequests thus complicated constitute, therefore, an integer; they must all be reduced to writing, or all will be void. And so too, I conceive, if land be devised to an only son, and slaves to the value of the land to an only daughter, the two bequests must go together. They must be regarded as a unit. For if that to the daughter is effectual, while that to the son fails, the daughter will not only have the slaves bequeathed, but half the land also, against the express wishes of the testator. It is true that if he execute such a will, and the execution be defective as to the really, but good for personal estate, there is no remedy; but where the paper to be set up as a will has in fact never been-executed as such, and was not indeed designed identically to be the will; where it is proposed to set it up merely with the purpose of effectuating the intentions of the decedent, the impossibility of effectuating the whole, and the certainty of defeating his real wishes by setting up a part, is a conclusive objection to giving validity to that part. 3dly, it may 'safely be affirmed, I think, that if, when the deceased gives instructions for his will, which are written down, he declares that it shall not be his will until it is reduced to form and duly executed by him, the instructions themselves could not be propounded as a will. The case would be analogous to that of a nuncupative will, W'hich is. not good as such, if the testator at the *143 time declares that it shall not be his will unless reduced to writing. 7 Bac. Abr. 307. 4thly, if this be so, then it seems to follow that if a decedent give instructions for a will of lands, as well as personalty, and direct it to be reduced to form in order that he may execute it, it ought to be presumed that he did not design the instructions to be his will, since they could not operate to effectuate his whole will: and 5thly, it would seem clear that where a decedent gives instructions in writing for a will of lands and personalty, the provisions of which are so complicated with each other that a part cannot be carried into effect without violence to the general design, it must be presumed he intends that the instructions themselves shall not be his will. For it is reasonable to suppose he would prefer that the whole should fail, rather than that the great purpose of his will should be defeated, and a gross inequality established among those for whom" he intended equal benefit.
The application of these principles to the case at bar wdll inevitably lead to a decision against the will. For the circumstances of the case tend strongly to prove that the brief pencil notes taken by Parker, though made out from the conversation be had just held with the testator, and read over and approved by him, were intended to be qualified and rendered intelligible by the aid of Parker's memory of that conversation—that they were not final instructions for a will, but short memorandums to draw the will by, assisted by the developements of intention just before communicated to Parker, and that if he had returned with the will written substantially in accordance with the notes, and with no other change than in the form of the paper, it would not have been executed by a rational testator.
Again, this paper, not being executed as a will of lands, is not the final determination of the testator’s mind respecting his estate. It is clear from the paper *144 itself that he designed to pass his lands, and it is therefore clear that the drawing oat the will at length, and the due execution of the draught directed to be made, was not merely form, but it was substance. It was an act which he designed in order to render that will complete, which without it was incomplete. The realty and personalty throughout are so blended and linked together, that you cannot tear them apart without the grossest violation of the testator’s intention. Thus, all the estate real and personal is loaned to mrs. Rochelle during,life. Then it is provided that Mary Frances and Martha Eliza shall be educated and clothed. This of course is a charge upon the widow, as the whole estate is given to her. Now, the testator might very well have intended this charge upon his wife in respect of her enjoying both the lands and personalty, though it may be a very unreasonable burden, and one of which he did not dream, if she gets the slaves alone. So again, it is clear he had it at heart to keep the plantation and hands together: yet if this will is established, the hands go to the wife during wudowbood, and the land to the heirs. So again, the whole estate, in one event, is to go to his brothers’ children; the boys to take the land, and the girls to have as many more slaves in their shares as wmuld be equal to the value of the land. But establish this will, and the girls get the slaves to the value of the land, and if the brothers’ children are the heirs of the testator, they will get half the land also. Can this be said to be the testator’s will ? Is it not plain that under the pretext of effectuating his will, we are called on to violate bis every intention ? Is it not plain that we are invited to set up a paper as his will, which he did not design as such, which was in truth incapable of declaring his will, (since, for w-ant of due execution, it cannot be read as to the realty,) and which he intended should be substituted by an instrument so drawn out and executed as *145 to effectuate all his intentions ? The very cases which have been cited shew, that where the effectuating what has been reduced to writing would conflict with the general scheme and plan of disposition, and be incompatible with the general intent, it cannot be regarded as the testator’s will. “ The rule,” says sir John Nicholl, “ which I take to operate in every unfinished paper is this : Can the court infer, that by pronouncing for it, it will carry into effect what it collects, from all the circumstances of the case, to have been the deceased’s wish? In that event it will be its duty to pronounce for it; but surely not, if it sees reason to believe that by so doing, it will defeat or counteract, instead of giving effect to that wish.” Montefiore v. Montefiore, 2 Eng. Eccl. Rep. 343. And again, In the goods of Herne, 3 Id. 95. he says: “ The presumption of law in every unfinished paper is, that the deceased never did intend it to take eflect in its unfinished form ; and that presumption is always held to be strengthened, when the paper, as in the present instance, purports to dispose not only of personal, but also of real property, as to which it clearly must be insufficient.” In such case indeed the presumption may be rebutted by testimony of the recognition of the paper as his will, notwithstanding its incapacity to pass lands; but without such evidence, the presumption against it must prevail. For “the presumption of law is against every testamentary paper not actually executed by the testator, and so executed as it is to be inferred, on the face of the paper, that the testator meant to execute it.” 2 . Eng. Eccl. Rep. 342. And this presumption, we see, is strengthened where it purports to dispose of real estate. Now in the present case the presumption, instead of being repelled, is strongly sustained. The whole testimony proves that the paper in question was never designed by testator or scrivener to be the will itself. *146 It is distinctly declared to have been a mere memorandum by which the will was to be written; and the lestator said of it, that he had given to Parker the heads of his will for the purpose of writing his will, and that Parker was to be there on friday with his will. As his disease advanced and he felt his end approaching, his anxiety for the arrival of Parker became extreme; he stated that he was surprised he had not come; that if he would come and fix his business, he would die perfectly satisfied. He added, indeed, that his will was not all the business he wanted with him, but that he must go and leave it all, for that he should not live till night. I am perfectly satisfied from this testimony, that the testator looked-to the execution of the will he had directed Parker to draw, as necessary to prevent his dying intestate, and that the memorandum was not in that form in which he purposed “ that his will should be, as an operative testamentary .paper.” See Jameson v. Cooke, 3 Eng. Eccl. Rep. 38. To me indeed it appears’ perfectly clear that a memorandum for a will purporting to dispose of real and personal estate, so blended as to be incapable of separation without thwarting the general intention, never can be considered as a good will, in the absence of execution or express recognition of it as such. For it is conceded that the paper propounded must contain the fixed and final determination of the deceased, and that the paper, as admitted, must effectuate and not thwart his wishes. But that can never be where the devises of realty and personalty are blended together, and so dependent on each other, that the effectuation as to the personalty, .and the failure of the will as to the realty, must altogether defeat the objects of the testator. Such is the case here; and I am therefore clearly of opinion to reverse the sentence, and to refuse the probate to the memorandum, even as a will of personalty.
*147 The other judges concurring, judgment reversed. And this court proceeding &e. is of opinion that the said paper writing is not the true last will and testament of the said William L. Rochelle deceased. Therefore, motion of defendant to admit Lhe same to record overruled, with costs in circuit court.